Brent Johnson, 7558
Brett L. Foster, 6089
Bryan K. Benard, 9023
HOLLAND & HART LLP
60 E. South Temple, Suite 2000
Salt Lake City, Utah  84111-1031
Telephone:  (801) 595-7800
Facsimile:  (801) 364-9124

*Attorneys for Plaintiff*
*IKANO Communications, Inc.*

RECEIVED CLERK

**FILED**

2002 AUG 14  P 5: 29

U.S. DISTRICT COURT
DISTRICT OF UTAH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IKANO COMMUNICATIONS, INC., a Utah corporation, | **COMPLAINT** |
| Plaintiff, | Civil Action No.: |
| vs. | Judge: |
| BIG PLANET, INC., a Delaware corporation, NU SKIN ENTERPRISES, INC., a Delaware corporation, A.J. ALLEN, KAY BELL, DAVE BLACK, TERRY BLAINE, GUY BROWN, PAM CENANY, MIKE CHAPMAN, LESA COLE, DALE COLVIN, STEPHEN DAVIS, SUZANNE FRANCO, JONI GLENN, TINA HAYNES, RICHARD KNIGHT, MYRNA KURTZ, PAUL MAGLEBY, MARY MAGOON, CAROL MARIER, KENT MARSHALL, LINDA MEEH, SETH MILLER, PAT O'CONNOR, WENDY SPECHT, and DOES 1 through 10,000 inclusive, | **2 02 C V - 929    JTG** |
| Defendants. | |

Plaintiff, IKANO Communications, Inc. ("**IKANO**"), by and through its counsel of record, Holland & Hart LLP, asserts the following complaint against Defendants, Big Planet, Inc. ("**Big Planet**"), Nu Skin Enterprises, Inc. ("**Nu Skin**"), A.J. Allen, Kay Bell, Dave Black, Terry Blaine, Guy Brown, Pam Cenany, Mike Chapman, Lesa Cole, Dale Colvin, Stephen Davis, Suzanne Franco, Joni Glenn, Tina Haynes, Richard Knight, Myrna Kurtz, Paul Magleby, Mary Magoon, Carol Marier, Kent Marshall, Linda Meeh, Seth Miller, Pat O'Connor, Wendy Specht, and Does 1 through 10,000 and seeks relief as follows:

## PARTIES

1.      IKANO is a corporation organized under the laws of the State of Utah, whose principal place of business is Salt Lake City, Utah.  IKANO is an Internet service provider that offers dial-up and DSL access services.  Internet service providers, such as IKANO, are referred to in this Complaint as an "**ISP**".

2.      Big Planet is a corporation organized under the laws of the State of Delaware, with its principal office located in Provo, Utah.  Big Planet is an Internet service provider that is also engaged in the business of marketing products and services using the Internet.  IKANO is informed and believes and thereon alleges that Big Planet is a wholly owned subsidiary of Nu Skin Enterprises, Inc and/or an agent of Nu Skin.

3.      Nu Skin is a corporation organized under the laws of the State of Delaware, with its principal office located in Provo, Utah.  Nu Skin is a worldwide creator and distributor of personal care products.

2

4.      IKANO is informed and believes and thereon alleges that although Big Planet and Nu Skin are related, the two companies do not have a unity of interest in all matters, they conduct business separately, and all of the essential business operations of the two companies are handled separately.

5.      IKANO is informed and believes and upon that basis alleges that A.J. Allen is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

6.      IKANO is informed and believes and upon that basis alleges that Kay Bell is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

7.      IKANO is informed and believes and upon that basis alleges that Dave Black is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

8.      IKANO is informed and believes and upon that basis alleges that Terry Blaine is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

9.      IKANO is informed and believes and upon that basis alleges that Guy Brown is or was an individual subscriber of Big Planet or a distributor of Nu Skin who,

3

as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

10.     IKANO is informed and believes and upon that basis alleges that Pam Cenany is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

11.     IKANO is informed and believes and upon that basis alleges that Mike Chapman is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

12.     IKANO is informed and believes and upon that basis alleges that Lesa Cole is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

13.     IKANO is informed and believes and upon that basis alleges that Dale Colvin is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

14.     IKANO is informed and believes and upon that basis alleges that Stephen Davis is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

15.     IKANO is informed and believes and upon that basis alleges that Suzanne Franco is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

16.     IKANO is informed and believes and upon that basis alleges that Joni Glenn is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

17.     IKANO is informed and believes and upon that basis alleges that Tina Haynes is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

18.     IKANO is informed and believes and upon that basis alleges that Richard Knight is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

19.     IKANO is informed and believes and upon that basis alleges that Myrna Kurtz is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

20.     IKANO is informed and believes and upon that basis alleges that Paul Magleby is or was an individual subscriber of Big Planet or a distributor of Nu Skin

5

who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

21.    IKANO is informed and believes and upon that basis alleges that Mary Magoon is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

22.    IKANO is informed and believes and upon that basis alleges that Carol Marier is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

23.    IKANO is informed and believes and upon that basis alleges that Kent Marshall is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

24.    IKANO is informed and believes and upon that basis alleges that Linda Meeh is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

25.    IKANO is informed and believes and upon that basis alleges that Seth Miller is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

6

26.    IKANO is informed and believes and upon that basis alleges that Pat O'Connor is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

27.    IKANO is informed and believes and upon that basis alleges that Wendy Specht is or was an individual subscriber of Big Planet or a distributor of Nu Skin who, as alleged more fully below, improperly accessed or used IKANO's services and is an agent of Big Planet and Nu Skin.

28.    IKANO is presently unaware of the true names and capacities of the Defendants named herein as Does 1 through 10,000, inclusive, and accordingly sue such Defendants by said fictitious names.  IKANO is further informed and believes that each of the said fictitious Defendants is in some manner responsible for and liable to IKANO as alleged herein and that at all times herein mentioned each of the said Defendants was acting as the agent for every remaining defendant and was acting within the course and scope of such agency.  IKANO will amend this Complaint to state the true names and capacities of said fictitious Defendants when the same have been ascertained by IKANO.

29.    At all times herein, each of the Defendants was the agent of each of the other remaining Defendants and at all times were acting within the course and scope of that agency.

7

## JURISDICTION

30.     This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331, 18 U.S.C. §§ 1028, 1029 and 1030 (the Computer Fraud and Abuse Act

("CFAA")), 18 U.S.C. §§ 2520 and 2701 (the Electronic Communications Storage Act

("ECSA")). This Court has supplemental jurisdiction over the remaining claims in this

dispute pursuant to 28 U.S.C. § 1367.

## VENUE

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  In

addition, pursuant to the Internet Access Provider Agreement dated June 1, 2000 (the

**"Original Agreement"**), attached hereto as Exhibit A and incorporated by reference,

any action to enforce the Original Agreement must be brought in either Utah County or

Salt Lake County, Utah, and the parties have waived any objection to improper venue in

those courts.  Moreover, several of the actions taken and the injuries caused occurred

within this judicial district, and a significant portion of the property at issue, as well as

some of the Defendants, are also found in this judicial district.

## GENERAL ALLEGATIONS

### THE PROVIDER AGREEMENT

32.     On June 1, 2000, Big Planet and IKANO entered into the Original

Agreement.  On October 16, 2000, the parties entered into an Amendment to the

Original Agreement (the **"Amendment"**).  The Amendment is attached hereto as

Exhibit B and incorporated by this reference. The Original Agreement, as amended by

the Amendment, is called "the **Provider Agreement**" in this Complaint.

8

33.     The term of the Original Agreement was for one year beginning June 1, 2000. (Exhibit A, ¶ 5.1). Either party had the right to terminate the Original Agreement for cause. (*Id.*) To terminate the Original Agreement, however, a party must give written notice of its intent to terminate and the other party would then have 30 days to cure the purported problems. (*Id.*) If the party does not correct the problems within the 30 days allotted, then the other party may terminate the Original Agreement. (*Id.*) The pricing structure of the Original Agreement established that Big Planet would be charged $0.36 per hour of connectivity to the Internet.

34.     As more fully described below, Big Planet had a substantial problem with unauthorized multiple logins by individual subscribers, and Big Planet thus knew that a per hour charge for Internet services would not be profitable. Without disclosing this problem to IKANO, Big Planet sought to amend the Original Agreement. On October 16, 2000, the parties executed the Amendment. The Amendment extended the term of the Provider Agreement to October 13, 2003. (Exhibit B, ¶ 4). The Provider Agreement would then be renewed automatically each year on the same terms for subsequent one-year periods unless either party notified the other party of its intent to terminate at least 180 days prior to the expiration of the term. (*Id.*) The right to terminate the Provider Agreement and the 30-day right to cure provisions remained the same.

35.     The Amendment expanded the duties that IKANO would provide to Big Planet and altered the pricing structure. Specifically, rather than being charged a per hour fee, the Amendment changed the pricing to a fixed monthly amount per subscriber

account.  Under the Amendment, Big Planet agreed to pay $10.50 per month per subscriber to IKANO.

## THE INTERNET SERVICES PROVIDED BY IKANO

36.     Pursuant to the Provider Agreement, IKANO agreed to provide its Internet service provider network comprised of a computer network, network operations centers, IKANO providers, points of presence (**"POPs"**), billing operations, other infrastructure and equipment, dial-up access numbers and parameters.  These services are generally described in Schedule 1 to Exhibit A.

37.     Big Planet was to place its Internet users on the IKANO system and give them dial-up access numbers to use IKANO's electronic communications services.  These Big Planet users are generally described as **"Subscribers"**.

38.     By October 2000, Big Planet and IKANO desired to expand the scope of their relationship by having IKANO increase the services provided to Big Planet in order to provide "turnkey" support and services to all of Big Planet's subscribers to dial-up Internet access.

## IKANO'S ASSUMPTION OF BIG PLANET'S UUNET AGREEMENT

39.     Prior to October 2000, Big Planet had an existing service agreement with UUNet Technologies, Inc. (**"UUNet"**).  IKANO is informed and believes and on that basis alleges that Big Planet had incurred significant charges from UUNet because UUNet was charging Big Planet for each hour of connectivity.  By that time, Big Planet had incurred $614,000.00 in charges to UUNet that it had not paid.

40.     As pleaded more specifically below, IKANO is informed and believes and on that basis alleges that Big Planet discovered that there was widespread misuse and abuse of Big Planet's Internet services resulting in, among other things, unlawful sharing of accounts, simultaneous logins on the same accounts and using programs to defeat system timers to limit inactivity.  As a result, Big Planet decided to avoid incurring similar charges in the future by convincing IKANO to assume its obligations to UUNet, without disclosing its subscribers' widespread misuse and abuse of Internet services.

41.     IKANO is informed and believes and on that basis alleges that UUNet knew about this serious misuse and abuse of Big Planet's subscribers.  IKANO is further informed and believes and on that basis alleges that Big Planet and UUNet were aware that individual subscribers were exceeding 30 hours of Internet use within a month, which is above the average Internet usage per month.  IKANO is also informed and believes that Big Planet and UUNet were also aware that individual Big Planet subscribers were exceeding 150 hours of Internet use within a month, which is considered a gross abuse and misuse of Internet services such that companies such as UUNet charge a substantial penalty for each hour of connectivity beyond 150 hours per month.

42.     Despite this knowledge, neither Big Planet nor UUNet disclosed the pattern of misuse and abuse of Internet services demonstrated by Big Planet subscribers before IKANO agreed to assume the UUNet obligation, enter into the Amendment and into the agreement with UUNet.

11

43.     In an effort to reduce the costs of its monthly Internet charges, without reducing the abusive amount of Internet use, Big Planet convinced IKANO to (a) increase the services to be provided to Big Planet, (b) change to a fixed price per subscriber account and (c) assume its responsibilities to UUNet.  As such, IKANO, Big Planet and UUNet entered into negotiations to make IKANO directly responsible or liable to UUNet rather than Big Planet.

44.     At the same time IKANO and Big Planet entered the Amendment, which changed the price structure between IKANO and Big Planet from a per hour connection fee to a fixed rate per subscriber account, IKANO entered into an agreement with UUNet so that IKANO could use UUNet's POPs to provide increased services to Big Planet and its subscribers.  As part of the UUNet agreement, which IKANO entered into for the benefit of Big Planet, IKANO agreed to a substantial minimum commitment to UUNet each month, which is a significant monetary amount.

45.     IKANO agreed to this minimum commitment based on the representations from Big Planet concerning the size of Big Planet's existing subscriber base and Big Planet's assurances of growing its subscriber base and implementing aggressive marketing plans to accomplish the growth.

46.     As part of the new agreement between IKANO and UUNet, UUNet charged IKANO $8.00 per subscriber per month.  However, IKANO was required to pay UUNet $1.00 per hour for every hour or portion thereof used over 150 hours in a month by any individual subscriber.

12

47.     Based on the agreement between UUNet and IKANO and the Amendment, IKANO was positioned to make a gross profit of $2.50 per subscriber each month. IKANO's gross profit therefore would be completely eliminated, and it would incur a loss, for example, if an individual Big Planet subscriber used the Internet services for 153 hours in a month.  Big Planet knew that thousands of Big Planet subscribers were using Internet services for substantially more than 150 hours per month.  Because of Big Planet's and UUNet's past experience with the excessive hourly connectivity use by Big Planet's subscribers, and the fact that UUNet was set to charge IKANO $1.00 for every hour or portion thereof that a subscriber used over 150 hours, Big Planet and UUNet knew or should have known at that time that they were taking unfair advantage of IKANO and that they were attempting to wrongfully foist upon IKANO enormous Overage Costs (defined in ¶51 below).  Nonetheless, although Big Planet and UUNet were aware of the high connectivity rates, due to the multiple login and sharing of passwords problems, and in addition, were both aware that the new fixed price per subscriber account which IKANO was to agree to would not cover the actual connectivity charges that would be incurred, neither Big Planet nor UUNet mentioned any of these material facts to IKANO.  Indeed, Big Planet and UUNet knew or should have known that IKANO's assumption of Big Planet's UUNet obligations would result in substantial Overage Costs (defined in ¶51 below) to IKANO.

48.     Although IKANO entered into its own separate contract with UUNet, in practical effect, in reliance upon Big Planet's representations, IKANO stepped into Big Planet's shoes, relieved Big Planet of its contractual obligations to UUNet and

13

undertook a significant financial commitment.  Unfortunately, Big Planet's representations were known to be false to Big Planet at that time and/or were made recklessly without sufficient knowledge on the part of Big Planet to make such representations.  In addition, Big Planet failed to disclose all material facts to IKANO.

49.    Big Planet's knowledge of the falsity of and/or its recklessness in making the above representations, or its knowledge of its material admissions, is further demonstrated by the fact that soon after entering into the Amendment, Big Planet unilaterally terminated approximately 5,000 subscribers, which was not disclosed to IKANO prior to the execution of the Amendment.  This action jeopardized IKANO's ability to achieve its minimum obligations with UUNet, since IKANO directly lost the income of those fixed rate accounts.

50.    In addition, the falsity of Big Planet's representations is further demonstrated by the fact that throughout the duration of the Provider Agreement, IKANO discovered that Big Planet's subscriber base was not as extensive as had been represented to IKANO.   Furthermore, Big Planet failed to follow through with its promise to aggressively market its services and expand its subscriber base.

### BIG PLANET'S CONCEALMENT OF SERIOUS INTERNET SERVICES ABUSE AND MISUSE

51.    IKANO is an Internet service provider that offers dial-up and DSL access services.  To provide services to its customers, IKANO purchases telephonic access to the Internet from third-party vendors such as Qwest and UUNet.  Such third-party vendors charge IKANO a certain price for every hour of connectivity to the Internet by anyone accessing the Internet through IKANO's services. Specifically, IKANO is

14

typically charged a flat rate from some third-party vendors for the initial 150 hours of connectivity per user of its Internet services. For each hour or portion thereof that a user uses the Internet over the 150 hour mark, however, IKANO is charged a premium. These extra charges for network use are called overages (hereinafter referred to as "**Overage Costs**").

52. On information and belief, the average dial-up Internet user is connected to the Internet for approximately 30 hours per month. In fact, in IKANO's agreement with UUNet (which replaced Big Planet's direct contract with UUNet), UUNet retained the right to change any price structure for any user that used the Internet more than 30 hours per month in two consecutive months. Thus, the 150 hours per month allowed by IKANO's third-party vendors before applying the Overage Cost penalty is five (5) times the normal usage by a typical Internet user.

53. The dial-up Internet services at issue in this case are very distinct from other types of Internet services such as dedicated Internet connections like DSL access services. Dial-up Internet services are designed for intermittent use. Users of dial-up Internet services are temporarily connected for a period of active use, and then are disconnected. In contrast, users of dedicated access services (such as a DSL connection) enjoy a continuous, dedicated connection to the Internet. The bandwidth of a typical dial-up Internet service is 56K. The bandwidth of a dedicated connection (such as a DSL connection) typically runs from 256K to 1.5 Meg. Dial-up Internet services users share the same hardware and services with many other dial-up Internet users. Because dial-up Internet services are designed for temporary use, excessive use

15

damages other users who may get a "busy" signal when attempting to log on to the

Internet, and forces unexpected and grossly unreasonable Overage Costs on the ISP.  In

contrast, the user of a dedicated Internet connection (such as a DSL line) has its own

connection, does not ever get a busy signal if other dedicated users are connected, and

thus does not foist extra charges on the ISP if the connection is constantly maintained.

54.    Given the significant difference between dial-up Internet services and

dedicated connection Internet services, there is also a very significant cost difference.

A typical 56K bandwidth dial-up Internet service may cost $19.95/month.  A DSL

connection with a bandwidth of 256K may cost $200/month.  A DSL connection with a

bandwidth of 1.5 Meg. may cost up to $700/month.

55.    IKANO has employed customary protections to prevent network abuse and

overuse and to avoid Overage Costs.  For example, IKANO employs customary system

timers to limit inactivity.  That is, if end users are logged onto the Internet through

IKANO for a certain period of time during which there is no activity, IKANO's system

timers will terminate the connection.  This prevents misuse and abuse of its services

from persons logging onto the Internet and then staying connected 24 hours a day, but

not using the services.

56.    As another protection, IKANO, as well as most major Internet service

providers, avoids abuse and misuse of its Internet services by prohibiting the sharing of

accounts, and further prohibits simultaneous logins using the same accounts, i.e.,

usernames or passwords.

16

57. At the time IKANO entered into the Original Agreement and the Amendment with Big Planet, Big Planet had "Business Rules" that allowed only a single login per account, and prohibited simultaneous logins for a single account. In the event a subscriber violated these Business Rules, Big Planet charged such subscriber $1.50 per hour for each hour of simultaneous login as a penalty. Big Planet's Business Rules also prohibited subscribers from sharing login names and passwords with others. In general, Big Planet's Business Rules followed industry standards.

58. At the time Big Planet entered into the Original Agreement and Amendment with Big Planet, Big Planet's subscribers had established a pattern of abuse and misuse of the Internet services Big Planet provided. Big Planet had (on information and belief, for a significant amount of time prior to the negotiation of the Original Agreement and Amendment) refused to enforce its Business Rules that resulted in a very serious and wide spread "simultaneous login problem."

59. Big Planet failed to disclose to IKANO, and on information and belief concealed from IKANO, the serious simultaneous login problem of Big Planet's subscribers when it negotiated and consummated the Original Agreement and Amendment.

60. Specifically, IKANO has noted hundreds of instances where individual subscribers have made multiple logins on the same account during the same 24-hour period. The end result of such multiple login use has produced several usernames accumulating thousands of hours of usage during a month when only 720 hours even existed in that month.

17

61.    IKANO relied upon the contract provisions in the Provider Agreement and assumed that Big Planet would comply with the Provider Agreement by enforcing its use policies to avoid Overage Costs.  For example, Section 1.6 of the Provider Agreement states that "Big Planet agrees to require all Subscribers that it authorizes to use the IKANO Service to comply with Big Planet's Acceptable Use Policy and Subscriber Agreement."  (Exhibit A, ¶ 1.6).

62.    Big Planet's Acceptable Use Policy and Subscriber Agreement (the **"Subscriber Agreement"**) explains that:

> Sharing Unlimited or metered accounts with anyone other
> than immediate family members [who are currently residing
> within your home], or re-selling service without express
> written consent from Big Planet, or offering any public
> information service, such as running a web server or FTP
> server, is prohibited. Using programs to defeat system timers
> limiting inactivity is prohibited. Untimely payment of any
> and all amounts due may result in account cancellation.
> (Bracketed language is from Big Plant's currently posted
> Appropriate Use Policy.)

63.    The foregoing provision of the Subscriber Agreement specifically restricts subscribers from, among other things, sharing accounts and using programs to defeat system timers that would otherwise limit inactivity.  The Subscriber Agreement also provides that (i) Big Planet will respond if it becomes aware of inappropriate use by subscribers, and (ii) Big Planet will immediately terminate service for flagrant violations of the Subscriber Agreement.

64.    In Big Planet's Subscriber Agreement, the license granted to subscribers therein provides that the services will be used solely for the personal use of the individual subscriber.  The Subscriber Agreement also requires that each subscriber (i)

18

must keep confidential any password used to access the service, (ii) may not transfer any rights to the service, and (iii) is required to pay for all charges incurred through the use of the service, including additional usage fees and surcharges for simultaneous logins.

65.     These restrictions, which are incorporated into the Provider Agreement, were designed to prevent abuse of network services, whether in the form of account sharing (as evidenced by multiple users or simultaneous logins of a single account) or programs designed to defeat system timers.  Big Planet's obligations under Section 1.6 of the Provider Agreement to require compliance with the Subscriber Agreement were not only absolute, their importance is reinforced by the unique position of Big Planet due to its relationship with the subscribers.  These restrictions are consistent with industry standards.

66.     These restrictions are further appropriate and necessary to prevent the violation of both the CFAA and the ECSA.

67.     In addition, pursuant to Section 1.6 of the Provider Agreement, Big Planet agreed to "indemnify and hold harmless IKANO from any and all loss or damage that may occur as a result of a Subscriber's use of IKANO's network pursuant to the Internet access provided by the Agreement.  Further, Big Planet specifically acknowledges that it is obligated to pay IKANO for all Internet access in accordance with this Agreement regardless of whether a Subscriber actually pays for such access."

19

### BIG PLANET'S DECISION TO IGNORE ITS BUSINESS RULES, IGNORE ITS SUBSCRIBER AGREEMENT, AND BREACH THE PROVIDER AGREEMENT

68.     On information and belief, before Big Planet and IKANO entered into the Original Agreement and Amendment, Big Planet was conducting an internal investigation of a serious simultaneous multiple login problem. On November 17, 2000, Laurel Miller explained in an email memorandum, that Big Planet had recognized a simultaneous login problem with its subscribers and discussed several options to remedy the problem. A true and correct copy of this email memorandum is attached as Exhibit C hereto. Mr. Miller recognized that Big Planet was currently allowing its subscribers to make multiple logins and was not charging its subscribers for this additional use. This conduct violated Big Planet's Business Rules, the Subscriber Agreement and also breached the Provider Agreement. Indeed, Mr. Miller candidly recognized that "all major providers do not allow a multiple login account." *Id.*

69.     Mr. Miller further explained in this memorandum that Big Planet had the option of eliminating the multiple login problem by implementing software to prevent the problem, by conforming to similar practices of major suppliers or by outsourcing the problem to a third party (which would not likely be "able to support a billing function for multiple logins"). *Id.* In addition, Mr. Miller described that Big Planet could create the necessary infrastructure to meet the business needs. *Id.* All of these options would be costly to Big Planet. *Id.*

70.     Mr. Miller also explained that in the past, Big Planet had attempted to enforce the Business Rules against multiple logins but that Big Planet had finally "capitulated" and decided to abandon that practice, stating:

20

> "Big Planet has, in the past, attempted enforcing the
> business rules and finally capitulated, by enabling users
> multiple logins without billing because that was less
> expensive than managing the multiple logins and billing for
> them."

*Id.*

71.     IKANO is informed and believes and on that basis alleges, that Big Planet

decided to ignore the multiple login problems and attempt to pass the financial burden

of this significant simultaneous login problem onto IKANO.  As noted above, Big

Planet convinced IKANO to enter into the Amendment and change its hourly

connectivity price structure to a fixed monthly subscriber account price, in order to

place the burden of paying for the multiple login problem on IKANO.

72.     Big Planet, however, never mentioned this ongoing multiple login

problem to IKANO.  Big Planet never disclosed to IKANO its internal investigation

concerning the significant Internet services abuse by its subscribers.  Big Planet also

never disclosed that it had "finally capitulated" and decided in or prior to November of

2000, almost at the same time IKANO and Big Planet entered into the Amendment, to

enable its "users multiple logins without billing for them," even though that decision

resulted in a clear and obvious violation of the Provider Agreement.  Finally, Big Planet

failed to disclose to IKANO that it made this decision because it "was less expensive"

and because the costs of Big Planet's failure to enforce its Business Rules and abide by

the Provider Agreement, and thus enforce Big Planet's Subscriber Agreement, were

borne solely by IKANO through the accrual of Overage Costs as the abuse and misuse

of its services continued.

73.     On information and belief, notwithstanding its financial commitments, Big

Planet consciously chose a course of conduct to breach the Provider Agreement with

IKANO in complete disregard of the financial consequences to IKANO, merely because

it would be financially more advantageous to breach the Provider Agreement than to

abide by it.  Furthermore, on information and belief, Big Planet intentionally concealed

its decision to breach the Provider Agreement from IKANO.

74.     Because Big Planet refused to enforce its Subscriber Agreement and

Business Rules in violation of the Provider Agreement, Big Planet subscribers, as

agents for Big Planet and Nu Skin, misused and abused IKANO's services.  Such

misuse and abuse resulted in significant Overage Costs, which IKANO was forced to

pay.

75.     The misuse and abuse of IKANO's services resulting in Overage Costs

was facilitated by (a) actions by Subscribers that they knew or should have known were

not authorized or permitted by the Subscriber Agreement; and (b) Big Planet's failure to

honor the Provider Agreement and thus enforce its own Business Rules and Subscriber

Agreement.

76.     Big Planet was fully aware of the Overage Costs before entering into the

Amendment.  As noted above, Big Planet had incurred significant charges from UUNet

prior to the time the Amendment was signed based on the high amount of connectivity

its subscribers used.  Prior to the Amendment, IKANO had no involvement with Big

Planet's UUNet accounts; rather, Big Planet did business directly with UUNet.  IKANO

22

was not aware of, nor could have been aware of the fact that the connectivity amounts were so high due to multiple logins using the same username or password.

77.     Recognizing, however, that it could lower its costs by simply paying a fixed rate per subscriber account (and notwithstanding the unfair and undisclosed financial burden that would impose upon IKANO), Big Planet induced IKANO to enter into the Amendment and agree to a fixed price per subscriber.  IKANO, however, had no reason to suspect this fraudulent motive on the part of Big Planet because Big Planet did not inform IKANO of the multiple use and other problems, and in fact had agreed through the Original Agreement to enforce its Subscriber Agreement to prevent such misconduct.  As such, IKANO believed that Big Planet had a sufficient number of subscribers, at an average rate of 30 hours per month, to fulfill its obligations to UUNet, based on the high number of hours of connectivity per month.  Big Planet was fully aware that in fact it had far fewer subscribers than IKANO expected because of the multiple login and other problems.

78.     IKANO has repeatedly informed Big Planet of Big Planet's non-compliance with the network use restrictions contained in the Subscriber Agreement. Since discovering these issues, IKANO has provided Big Planet with monthly reports detailing the abuses of IKANO's services and the Overage Costs IKANO has had to bear.  Numerous discussions relating to this problem have occurred, dating back to October 2000.  As more fully explained above, Big Planet's knowledge of widespread network abuse by subscribers was identified in an email memorandum dated November 17, 2000 from Laurel Miller of Big Planet to other Big Planet and Nu Skin employees.

79.     Big Planet and Nu Skin had prior knowledge of the multiple login problem, knew of the extensive costs that would be incurred to correct the problem, and intentionally acted to allow the abuse by shifting the costs of non-compliance to IKANO through Defendants' failure to comply with its obligations under the Provider Agreement and through the change in pricing structure without disclosure of the substantial preexisting abuse by their Subscribers.  IKANO is informed and believes that some of the Overage Costs were created by Nu Skin's distributors, which distributors were so important to Nu Skin, that Nu Skin directed that Big Planet not enforce its Business Rules and the Subscriber Agreement.  IKANO further alleges that the individual Defendants have each contributed to the Overage Costs as well by intentionally or recklessly violating the Big Planet Business Rules and the Subscriber Agreement.

80.     Big Planet has also allowed network abuse, which has resulted in Overage Costs, by promoting the use of programs to defeat system timers limiting inactivity. Big Planet placed on its own customer help website specific instructions that allow subscribers to disable IKANO's system timers which limit inactivity and thus manage their Internet connections so as to avoid any disconnects.  In particular, these instructions deal with computer control panel and email settings.  This abusive practice – which violated the Subscriber Agreement and Provider Agreement – was not only tolerated by Big Planet, but encouraged.

81.     This activity in defeating system timers was one of the primary causes of the network Overage Costs.  Big Planet, Nu Skin, their subscribers/distributors, and the

individual Defendants have operated together in participating in the above described network abuse.

82.    IKANO has repeatedly informed Big Planet of these Overage Costs beginning with the first billing received from UUNet after the Amendment was executed.  Big Planet has, at various times, acknowledged the Overage Costs to IKANO resulting from Big Planet's subscriber abuses.

83.    IKANO is informed and believes that Nu Skin distributors using the Big Planet/IKANO Internet services incurred many of the Overage Costs.  Specifically, the individual Defendants listed in this Complaint have each participated in these abusive practices resulting in multiple logins, excessive hours of usage, and Overage Costs. Indeed, IKANO has already identified 3,997 usernames that appear to have participated in the widespread abusive practices set forth herein.

84.    IKANO is further informed and believes that because of the importance of these distributors to Nu Skin, that Nu Skin directed Big Planet to refrain from enforcing the Subscriber Agreement related to subscriber use, which resulted in a breach of the Provider Agreement by Big Planet.

85.    In an effort to assist Big Planet in complying with its obligations under the Provider Agreement, IKANO had repeated discussions with Big Planet regarding ways to minimize subscriber abuse of IKANO's electronic communications services. To further address this problem, at a substantial cost, IKANO designed, created and employed a fraud protection program to identify subscribers who were abusing the network by either permitting simultaneous logins with a single account or using means

25

to disable inactivity controls that effectively transformed the dial-up service into a dedicated connection (without paying for it). IKANO's fraud protection program was designed to save hundreds of thousands of dollars in Overage Costs resulting from subscriber abuse.

86.     Rather than adopting IKANO's fraud protection program to curb abuse of IKANO's services, Big Planet exacerbated the abuse. Specifically, Big Planet configured its radius servers to accept any and all usernames, with or without passwords, and thus completely circumvented IKANO's fraud protection program and even basic safeguards. This action has resulted in additional Overage Costs, further damaging IKANO.

### BIG PLANET'S FAILURE TO TRANSITION TO A TURNKEY SERVICE

87.     With respect to providing "turnkey" Internet support and services to Big Planet as described in the Provider Agreement, Big Planet has prevented IKANO's attempts to perform. IKANO has repeatedly encouraged Big Planet to make the transition, since IKANO has been able to provide turnkey ISP services to Big Planet from the outset of the Provider Agreement and has made numerous efforts to complete the outsourcing project.

88.     IKANO has a proprietary Business Rules Platform that is unique in the outsourcing industry and is operating effectively for over 200 ISP customers, including many companies substantially similar to Big Planet. IKANO has established a proven track record of working through and solving complex outsourcing and data networking issues. This track record was evidenced by IKANO's selection as the official supplier

of data networking services for the 2002 Olympic Winter Games and recognition as one of the leading call centers in the country.

89.     Big Planet, however, failed to follow through with commitments made to IKANO to outsource its ISP services that have prevented the migration of services from Big Planet to IKANO.  IKANO has stood ready, willing, and able to work with Big Planet to provide the necessary transition and data feeds.  Big Planet, however, has continually changed personnel, scope requirements and deadlines, and caused perpetual delays, thereby making it impossible for IKANO to complete this project.

90.     Ultimately, Big Planet unilaterally terminated its efforts to complete the outsourcing project and failed to transition to IKANO's "turnkey" support and service.  This abandonment violated the obligations of Big Planet in Sections 1(b) and 3 of the Amendment.

### BIG PLANET'S REFUSAL TO PAY FOR IKANO'S SERVICES

91.     In further violation of its obligations under the Provider Agreement, Big Planet has refused to pay several invoices provided to Big Planet by IKANO for work and services performed.  As of the beginning of April/2002, the amount of unpaid invoices totaled $851,990.86.

### BIG PLANET'S UNLAWFUL TERMINATION AND BREACH OF THE PROVIDER AGREEMENT

92.     On April 4, 2002, IKANO received a letter from Big Planet, giving IKANO notice that Big Planet intended to terminate the Provider Agreement effective May 4, 2002, and raising several purported problems that IKANO must remedy under the Provider Agreement.  While Big Planet admitted in the letter that IKANO had 30

27

days to correct the problems outlined in the letter, Big Planet unequivocally indicated
that it believed IKANO would not, or could not cure the problems, and assumed that the
Provider Agreement would be terminated on May 4, 2002.

93.    In fact, Big Planet was so unwilling to allow IKANO the 30 days to cure
the problems, that Big Planet immediately asked IKANO to provide transfer of service
orders, by the end of business on April 5, 2002.  Such transfer orders were only
required to be provided to Big Planet once the Provider Agreement had been
terminated.

94.    While the parties conducted further discussions regarding the termination
of the Provider Agreement and IKANO specifically demonstrated that it had, and
would, cure any purported problems raised by Big Planet, Big Planet still maintained
that the Provider Agreement would terminate on May 4, 2002.  Big Planet took this
position regardless of the efforts made by IKANO and as such, wrongfully terminated
the Provider Agreement.

95.    Moreover, Big Planet threatened IKANO by indicating it would be
deducting massive portions of the amounts due to IKANO, or to be due IKANO, under
the Provider Agreement.  Big Planet was set to continue its practices to produce huge
Overage Costs without paying for those charges.

96.    In light of these circumstances, IKANO was compelled to mitigate its
damages by acquiescing to a transition of its services under the Provider Agreement,
without prejudice to pursue complete redress.  On April 30, 2002, Big Planet and
IKANO entered into a Transfer/Disconnect Agreement, a copy of which is attached

28

hereto as Exhibit D and incorporated by reference.  The Transfer/Disconnect Agreement specifically indicates that it "does not waive, alter or modify any of the terms or conditions, or the parties' rights, liabilities or claims, pursuant to the Agreements previously entered into between the parties, and does not operate as a novation or accord and satisfaction of any such claims."

### THE GENUITY AGREEMENT

97.     In early 2001, IKANO and Big Planet had been in discussions related to the launch of Big Planet's DSL offering through IKANO and how IKANO could improve and strengthen the DSL offering.  Pursuant to these discussions, IKANO approached Genuity, Inc. ("**Genuity**") about its DSL services.

98.     On February 14, 2001, IKANO and Big Planet entered into a letter agreement regarding DSL service offered by Genuity, which is attached hereto as Exhibit D and incorporated by reference (the "**Letter Agreement**").  In the Letter Agreement, IKANO specifically explained to Big Planet that to meet Big Planet's aggressive marketing and pricing requirements, Genuity would require IKANO to commit to a specific number of subscribers.

99.     The Letter Agreement further indicates that IKANO would only be willing to commit to Genuity if Big Planet in turn, committed to providing IKANO with 1500 DSL subscribers by June 1, 2002.  Big Planet unequivocally accepted this commitment, as well as a commitment to pay for the full number of committed subscribers if the minimum amount was not met.

29

100.   Based on this commitment from Big Planet, IKANO entered into a service agreement with Genuity and made a minimum monthly commitment of subscribers to Genuity, amounting to a significant monthly payment to Genuity from IKANO.  The term of this agreement was 18 months, beginning June 1, 2002.  IKANO recently terminated its Agreement with Genuity and Genuity has acknowledged that termination. Nevertheless, all monies that had been paid or will be paid, or have been due and owing or are due and owing to Genuity are damages caused by the misconduct of Big Planet alleged above.

101.   When Big Planet made the above representations, Big Planet made the representations recklessly without sufficient knowledge to make such representations. The representations were false.  Big Planet did not provide IKANO with 1,500 DSL subscribers by June 1, 2002.

## FIRST CAUSE OF ACTION

(Violation of Computer Fraud and Abuse Act Against All Defendants)

102.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

103.   As more fully described above, IKANO provided to Defendants its high speed data processing Internet communications network, comprised of a computer network, network operations centers, IKANO providers, POPs, billing operations, other infrastructure and equipment, dial-up access numbers and parameters.  These services are generally described in Schedule 1 to Exhibit A.  The IKANO system is used by the Defendants in interstate and/or foreign commerce and communications.

30

104.   Defendants (Big Planet through its subscribers and Nu Skin through its distributors, and the individual defendants and DOES) engaged in the widespread misuse and abuse of IKANO's computerized communications services through subscriber sharing of accounts and subscriber use of programs to defeat system timers. In fact, Big Planet specifically provided instructions to its subscribers and to Nu Skin's distributors as to how they may avoid IKANO's system timers.

105.   Through the unauthorized sharing of passwords with others and by avoiding the system timers, Defendants intentionally accessed IKANO's system and exceeded their authorized access and obtained benefits to which they were not entitled. As a result, Defendants were able to obtain excessive Internet access to conduct their businesses without complying with the authorized access limits.  This activity violated the CFAA.

106.   The unauthorized sharing of passwords by Defendants without authorization to gain access and/or exceed authorized access to IKANO's system was made knowingly and/or with intent to defraud, in direct violation of the Subscriber Agreement (all Defendants except Big Planet and Nu Skin) or the Provider Agreement (Big Planet and Nu Skin).  This activity allowed Defendants to obtain valuable Internet access without having to pay the price for that usage.  Defendants have not paid for the Overage Costs that were created by these unauthorized, abusive practices.

107.   This activity did not comport with the reasonable expectations of IKANO nor acceptable industry standards.  Such overuse could have caused IKANO's system to be overloaded or to malfunction.

31

108.   IKANO is informed and believes and on that basis alleges, that in taking the actions described above, the Defendants, and each of them, were acting as agents of each of the other Defendants and were acting within the course and scope of that agency.

109.   As a direct result of the various unauthorized and abusive activities above, IKANO has suffered and will continue to suffer losses and damages, including loss of income, in such an amount that will be proven at trial, which greatly exceeds the statutory minimum amount of $5,000.00.  Defendants caused this damage intentionally or recklessly.

## SECOND CAUSE OF ACTION

(Aiding and Abetting Liability Under Computer Fraud and Abuse Act
Against All Defendants)

110.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

111.   Defendants knowingly transferred and/or used, without lawful authority, the passwords given to each of Big Planets' subscribers and Nu Skin's distributors, and/or the other Defendants.  Specifically, Defendants engaged in the widespread misuse and abuse of IKANO's electronic communications services through subscriber sharing of accounts and subscriber use of programs to defeat system timers.  This activity amounted to a violation of the CFAA.

112.   Big Planet and Nu Skin aided and abetted this behavior by not enforcing the Subscriber Agreement or the Business Rules, by explaining a step by step process to avoid system timers, in this endeavor, and by acquiescing in this behavior.

32

113.   IKANO is informed and believes and on that basis alleges, that in taking the actions described above, the Defendants, and each of them, were acting as agents of each of the other Defendants and were acting within the course and scope of that agency.

114.   As a direct result of the various unauthorized activities above, IKANO has suffered and will continue to suffer losses and damages, including loss of income, in such an amount that will be proven at trial, which greatly exceeds the statutory minimum amount of $5,000.00.  Defendants caused this damage intentionally or recklessly.

### THIRD CAUSE OF ACTION

(Violation of Electronic Communications Storage Act Against All Defendants)

115.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

116.   As more fully described above, IKANO provided to Defendants its high speed data processing Internet communications network, comprised of a computer network, network operations centers, IKANO providers, POPs, billing operations, other infrastructure and equipment, dial-up access numbers and parameters.  These services are generally described in Schedule 1 to Exhibit A.  The IKANO system is used by the Defendants in interstate and/or foreign commerce or communications.

117.   Defendants (Big Planet through its subscribers and Nu Skin through its distributors, and the individual defendants and DOES) intentionally accessed without authorization IKANO's electronic communications services through subscriber sharing

of accounts and subscriber use of programs to defeat system timers. In fact, Big Planet specifically provided instructions to its subscribers and to Nu Skin's distributors as to how they may avoid IKANO's system timers.

118. Through the unauthorized sharing of passwords with others and by avoiding the system timers, Defendants intentionally accessed IKANO's system and exceeded their authorized access and obtained benefits to which they are not entitled. As a result, Defendants were able to obtain excessive Internet access to conduct their business without complying with the authorized access limits. This activity violated the ECSA.

119. IKANO is informed and believes and on that basis alleges, that in taking the actions described above, the Defendants, and each of them, were acting as agents of each of the other Defendants and were acting within the course and scope of that agency.

120. As a direct result of the various unauthorized activities above, IKANO has suffered and will continue to suffer losses and damages, including loss of income, in such an amount that will be proven at trial, which greatly exceeds the statutory minimum amount of $5,000.00. Defendants caused this damage intentionally or recklessly.

34

## FOURTH CAUSE OF ACTION

(Federal Unfair Competition and Business Practices Against All Defendants)

121.    IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

122.    In taking the above actions, Defendants have participated in unfair competition and unfair business practices.  That the acts alleged above constitute unfair practices is established by the fact that Defendants have violated the CFAA and the ECSA.

123.    By taking the actions alleged above, Defendants have damaged IKANO's legitimate business interests in an unfair, improper and illegal manner.

124.    IKANO is informed and believes and on that basis alleges, that in taking the actions described above, the Defendants, and each of them, were acting as agents of each of the other Defendants and were acting within the course and scope of that agency.

125.    As a direct result of the unauthorized unfair, improper and illegal activities alleged above, IKANO has suffered and will continue to suffer losses and damages, including loss of income, in such an amount that will be proven at trial.

## FIFTH CAUSE OF ACTION

(Breach of Contract re Provider Agreement Against Big Planet and Nu Skin)

126.    IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

127.   IKANO and Big Planet entered into the Provider Agreement more fully discussed above and under the terms set forth in Exhibits A and B attached hereto.

128.   IKANO has performed all terms and conditions of the Provider Agreement and has always stood ready to perform its obligations under the Provider Agreement. After Big Planet provided written notice to terminate the Provider Agreement, IKANO fully cured and corrected any purported problems in its performance under the Provider Agreement.

129.   As more fully described above, Big Planet breached the Provider Agreement by not enforcing its Subscriber Agreement, by not preventing the widespread misuse and abuse of IKANO's services through subscriber sharing of accounts and subscriber use of programs to defeat system timers, and by not paying for the Overage Costs that were created by these usage problems.

130.   In addition, Big Planet breached, as outlined above, the Provider Agreement by not indemnifying and holding IKANO harmless from the Overage Costs created by the network abuses and by not paying for the Overage Costs.

131.   Big Planet further breached the Provider Agreement by not transitioning to "turnkey" Internet service and support from IKANO, as explained above.

132.   Big Planet also breached the Provider Agreement by not producing the amount of subscribers to IKANO that Big Planet represented would be using IKANO's services.

133.   Big Planet has also breached the contract by failing to pay several of the invoices produced to Big Planet by IKANO for various services and work performed by IKANO.

134.   Big Planet also breached the termination and right to cure provisions of the Provider Agreement and wrongfully forced the termination of the Provider Agreement.

135.   IKANO is informed and believes and on that basis alleges, that in taking the actions described above, Big Planet was acting as an agent of Nu Skin and was acting within the course and scope of that agency.  IKANO pleads this claim alternatively as against Nu Skin, since Nu Skin has taken the position that it cannot be liable for intentionally interfering with the IKANO/Big Planet Agreement, because as a parent corporation of Big Planet, Nu Skin cannot interfere with its "own" contract and is essentially the same entity as Big Planet.

136.   As a direct result of the various breaches alleged above, IKANO has suffered and will continue to suffer damages, including loss of income, in such an amount that will be proven at trial.

### SIXTH CAUSE OF ACTION

(Breach of Contract re Letter Agreement Against Big Planet and Nu Skin)

137.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

138.   IKANO and Big Planet entered into a Letter Agreement regarding minimum commitments of DSL subscribers on February 14, 2001, as more fully

discussed above and under the terms set forth in Exhibit D hereto. The Letter Agreement was a commitment by Big Planet of minimum DSL subscribers that IKANO required from Big Planet before IKANO would enter into a service agreement with Genuity.

139.   IKANO has performed all terms and conditions of the Letter Agreement and has always stood ready to perform its obligations under the agreement.

140.   Since Big Planet has terminated any relationship with IKANO related to the provision of services by IKANO to Big Planet, and no longer provides any subscribers to IKANO, Big Planet has breached the Letter Agreement relating to minimum monthly subscribers.

141.   IKANO is informed and believes and on that basis alleges, that in taking the actions described above, Big Planet was acting as an agent of Nu Skin and was acting within the course and scope of that agency. IKANO pleads this claim alternatively as against Nu Skin, since Nu Skin has taken the position that it cannot be liable for intentionally interfering with the IKANO/Big Planet Provider Agreement, because as a parent corporation of Big Planet, Nu Skin cannot interfere with its "own" contract and is essentially the same entity as Big Planet.

142.   As a direct result of the various breaches alleged above, IKANO has suffered and will continue to suffer damages, including loss of income, in such an amount that will be proven at trial.

## SEVENTH CAUSE OF ACTION

(Breach of Covenants of Good Faith and Fair Dealing Against Big Planet and Nu Skin)

143.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

144.   Under Utah law, every contract and business relationship includes a covenant of good faith and fair dealing with respect to dealings between the parties.  As such, the parties to a contract must deal fairly and honestly with each other.

145.   The above described conduct on the part of Big Planet denied IKANO the benefits and protections IKANO was entitled to under the Provider Agreement and under the Letter Agreement.

146.   By refusing to perform under the Provider Agreement, and more significantly, by taking actions designed to prevent IKANO from performing under the Provider Agreement, Big Planet breached the covenant of good faith and fair dealing. In addition, by taking actions to prevent IKANO from receiving the benefits it was to receive under the Provider Agreement, and specifically by instructing its subscribers in methods of abusing the network services provided by IKANO, Big Planet breached the covenant of good faith and fair dealing.  In addition, Big Planet improperly withheld its prior knowledge of the systemic multiple login problem that it had been experiencing and investigating prior to the Amendment.

147.   Big Planet further breached the covenant of good faith and fair dealing by inducing IKANO to assume Big Planet's obligations to UUNet.  Specifically, by misrepresenting its subscriber base to IKANO and providing other assurances, Big Planet induced IKANO to enter into a contract with UUNet and promise minimum monthly subscribers to UUNet.  In addition, Big Planet made material admissions

related to its subscriber multiple login problems and other problems that prevented IKANO from receiving the benefits under the agreements between the parties.

148.    Big Planet also breached the covenant of good faith and fair dealing with respect to the Letter Agreement, by terminating its relationship with IKANO and by failing to provide the subscribers that Big Planet promised to produce to IKANO.

149.    IKANO is informed and believes and on that basis alleges, that in taking the actions described above, Big Planet was acting as an agent of Nu Skin and was acting within the course and scope of that agency.  IKANO pleads this claim alternatively as against Nu Skin, since Nu Skin has taken the position that it cannot be liable for intentionally interfering with the IKANO/Big Planet Provider Agreement, because as a parent corporation of Big Planet, Nu Skin cannot interfere with its "own" contract and is essentially the same entity as Big Planet.

150.    As a direct result of Big Planet's breach of such covenants, IKANO has suffered and will continue to suffer damages, in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION

(Quantum Meruit/Unjust Enrichment Against All Defendants)

151.    IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

152.    IKANO provided valuable work and services to Defendants in the form of an Internet network of service, access and support and reasonably expected to be compensated for such.  Defendants were entitled to properly use IKANO's services without improperly sharing accounts or using programs to defeat the system timers.

40

Nonetheless, Defendants, by themselves or through their agents, shared accounts and defeated system timers which enabled them to obtain Internet service in excess of that permitted under any agreement between Defendants and IKANO.

153.   By allowing this practice of Overage Costs to continue, Defendants received a significant benefit, Internet service, for which they have refused to pay. These Overage Costs have been incurred by IKANO from third-party vendors.

154.   IKANO is informed and believes and on that basis alleges, that in taking the actions described above, the Defendants, and each of them, were acting as agents of each of the other Defendants and were acting within the course and scope of that agency.

155.   The reasonable value of these services and the amount by which Defendants have been unjustly enriched will be proven at trial.

### NINTH CAUSE OF ACTION

(Fraudulent Inducement Against Big Planet and Nu Skin)

156.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

157.   In negotiating the Amendment to the Provider Agreement, Big Planet undertook a course of conduct designed to transfer its direct responsibility to various Internet providers to IKANO without disclosing material facts related Big Planet's obligations and practices.  Specifically, Big Planet had an agreement with UUNet requiring significant monthly payments to UUNet from Big Planet.  By October/2000, Big Planet owed UUNet approximately $614,000.00 in connectivity charges.  These

41

charges were incurred in large part because of the multiple login and password sharing problems discussed above.

158.   In addition, prior to entering into the Amendment, Big Planet was fully aware of, and investigating the problem with unauthorized multiple logins by its subscribers. Big Planet recognized that multiple logins were not allowed and were against industry standards. Nonetheless, Big Planet determined that it was more cost effective for it not to enforce its Subscriber Agreement or Business Rules, or to utilize software to eliminate the problem. Instead, Big Planet sought to transfer the cost of this improper activity to IKANO, without informing IKANO of this extensive problem. Specifically, to calculatingly transfer these costs to an unsuspecting IKANO, Big Planet sought to change its pricing scheme with IKANO to a fixed price per subscriber account, regardless of the Internet usage by the subscriber.

159.   To induce IKANO to take over its obligations to UUNet, to increase its services under the agreement, and to change to a fixed account price regardless of Internet usage, Big Planet misrepresented its subscriber base and provided false assurances to IKANO that its subscriber base would continue to grow. In addition, Big Planet specifically omitted telling IKANO various relevant information regarding the multiple login abuse that Big Planet had already identified. Specifically, Big Planet failed to disclose to IKANO that many of its subscribers used well above the 30 hours of Internet connectivity per month that is an industry standard. Instead, Big Planet led IKANO to believe that Big Planet had the actual amount of subscribers, using an average amount of Internet connectivity hours per month, to support changing the

42

pricing structure and to support IKANO's assumption of the UUNet agreement and to undertake significant monthly commitments to UUNet.

160.    These representations were known to be false at the time Big Planet made the representations or were made recklessly without sufficient information to make the representations. In addition the omissions committed by Big Planet were material and resulted in fraudulent behavior toward IKANO. Disclosure of the true facts would have corrected a basic assumption upon which IKANO was relying on in deciding to enter into the Amendment and undertake additional responsibilities.

161.    Based on these representations and assurances, IKANO entered into a separate contract with UUNet, requiring IKANO to produce a guaranteed amount of subscribers each month. In addition, based on the omission of the significant unauthorized multiple login problem, IKANO was induced to enter into the Amendment and change to a fixed account price regardless of Internet usage.

162.    Similarly, with respect to Genuity, Big Planet induced IKANO to enter into an agreement with Genuity and to guarantee that IKANO could produce a minimum monthly amount of subscribers to Genuity. Big Planet in fact signed the Letter Agreement representing to IKANO that it would produce to IKANO 1500 DSL subscribers by June 1, 2002. Based on these representations, IKANO entered into a service contract with Genuity. Big Planet has not provided to IKANO the required 1,500 subscribers that should have been provided on June 1, 2002.

163.    The omissions committed by Big Planet induced IKANO to increase its services to be provided to Big Planet, increase the term of the relationship, accept fixed

43

account pricing regardless of Internet usage, and resulted in extensive Overage Costs to IKANO because of the continual unauthorized multiple login and system timer defeating problems.  These omissions amounted to a failure on the part of Big Planet to act in good faith and in accordance with reasonable standards of fair dealing.

164.   IKANO reasonably relied upon the representations, assurances and omissions provided by Big Planet and in ignorance of the pattern of abusive subscriber practices.  But for these representations, assurances or omissions, IKANO would not have increased it services to Big Planet, increased the term of the relationship, accepted the new pricing structure or assume Big Planet's obligations to UUNet and Genuity.

165.   The representations, assurances and omissions made by Big Planet were false or made recklessly without sufficient knowledge to support the representations, or with the intent to conceal material information from IKANO.  These representations, assurances, and omissions were made by Big Planet with the intent to induce IKANO to expand its obligations, and assume the obligations of Big Planet, in reliance on the representations, assurances and omissions by Big Planet.

166.   IKANO detrimentally relied upon those representations, assurances and omissions in deciding to increase its services to Big Planet, to accept a new pricing structure, to increase the term of the Provider Agreement, to enter into the contract with UUNet and to relieve Big Planet of its obligations to UUNet.  IKANO further detrimentally relied upon those representations and assurances in deciding to enter into the contract with Genuity.

167.   Now that Big Planet has ceased providing any subscribers to IKANO, IKANO cannot meet its minimum subscriber commitments created by the contracts it entered into with UUNet or Genuity, contracts IKANO would not have entered into but for Big Planet's representations and assurances.

168.   Due to Big Planet's glaring omissions related to the multiple login and other problems it has experienced and recognized since at least November 2000, IKANO unsuspectingly increased its services to Big Planet, continued providing its services to Big Planet, and has incurred significant Overage Costs because of actions of Defendants.

169.   IKANO is informed and believes and on that basis alleges, that in taking the actions described above, Big Planet was acting as an agent of Nu Skin and was acting within the course and scope of that agency.  IKANO pleads this claim alternatively as against Nu Skin, since Nu Skin has taken the position that it cannot be liable for intentionally interfering with the IKANO/Big Planet Agreement, because as a parent corporation of Big Planet, Nu Skin cannot interfere with its "own" contract and is essentially the same entity as Big Planet.

170.   As a direct result of the actions of Big Planet and Nu Skin, IKANO has suffered and continues to suffer damages, in an amount to be proven at trial.

171.   The above described conduct of Big Planet and Nu Skin was willful, malicious, fraudulent, and/or grossly negligent and demonstrates a knowing and reckless indifference to the rights of IKANO, such that an award of punitive damages to IKANO is warranted pursuant to Utah Code Ann. § 78-18-1.

## TENTH CAUSE OF ACTION

(Intentional Interference with Contract Against Nu Skin)

172.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

173.   Nu Skin had knowledge of all of the agreements, including the Provider Agreement and the Letter Agreement that had been entered into between Big Planet and IKANO.

174.   Upon information and belief, IKANO alleges that despite Nu Skin's knowledge of the contractual and business relationship between IKANO and Big Planet, Nu Skin intentionally interfered with the relationship and caused Big Planet to breach its agreements with, or alternatively, to terminate its agreements with IKANO.

175.   Specifically, with respect to the Overage Costs discussed above, IKANO is informed and believes and thereon alleges, that many of the Overage Costs were incurred by Nu Skin distributors using the Big Planet/IKANO Internet services. IKANO is further informed and believes that because of the importance of these distributors to Nu Skin, that Nu Skin directed Big Planet to refrain from enforcing the Subscriber Agreement related to subscriber use, which resulted in a breach of the Provider Agreement by Big Planet.

176.   Upon information and belief, IKANO alleges that Nu Skin thus interfered with the contractual relationship between IKANO and Big Planet for improper purposes and improper means, including but not limited to, injuring IKANO's business, creating substantial Overage Costs for IKANO because Nu Skin instructed Big Planet to not

46

enforce its use Subscriber Agreement, and damaging IKANO's ability to comply with other related Internet service agreements with third parties. In addition, the actions taken by or furthered by Nu Skin were improper, wrongful and illegal as they violated the CFAA and the ECSA, and constituted unfair competition and unfair business practices.

177.    Nu Skin had no justification, proper excuse or legal right to take these actions and the conduct did not further any legitimate business interests of Nu Skin. The actions of Nu Skin were undertaken by wrongful means and for an improper purpose.

178.    By intentionally interfering with the contractual and business relationship between IKANO and Big Planet, IKANO alleges on information and belief, that Nu Skin was the actual and proximate cause of the breach of contract and covenants of good faith and fair dealing by Big Planet.

179.    IKANO is informed and believes and thereon alleges (in the alternative to the claims set forth above), that Big Planet and Nu Skin do not maintain a unity of interest and are related, but separate, entities that have distinct business operations.

180.    As a proximate and foreseeable consequence of Nu Skin's interference with contract, IKANO has suffered and will continue to suffer damages, in an amount to be proven at trial.

181.    The above described conduct of Nu Skin was willful, malicious, fraudulent, and/or grossly negligent and demonstrates a knowing and reckless

indifference to the rights of IKANO, such that an award of punitive damages to IKANO is warranted pursuant to Utah Code Ann. § 78-18-1.

### ELEVENTH CAUSE OF ACTION

(State Unfair Competition and Business Practices Against All Defendants)

182.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

183.   In taking the above actions, Defendants have participated in unfair competition and unfair business practices. Defendants' conduct was unfair and improper under Utah law. The actions taken by Defendants demonstrate a concerted effort by Defendants to avoid the lawful charges for IKANO's telecommunications services. As such, the conduct violates Utah Code Ann., § 76-6-409.6, which is a class B misdemeanor under Utah law.

184.   By taking the actions alleged above, Defendants have damaged IKANO's legitimate business interests in an unfair, improper and illegal manner.

185.   IKANO is informed and believes and on that basis alleges, that in taking the actions described above, the Defendants, and each of them, were acting as agents of each of the other Defendants and were acting within the course and scope of that agency.

186.   As a direct result of the various unauthorized unfair, improper and illegal activities alleged above, IKANO has suffered and will continue to suffer losses and damages, including loss of income, in such an amount that will be proven at trial.

## TWELFTH CAUSE OF ACTION

(Civil Conspiracy Against All Defendants)

187.   IKANO hereby incorporates all of the foregoing allegations as if set forth in full herein.

188.   As an alternative to the agency allegations and liability alleged above, IKANO is informed and believes and thereon alleges that Defendants entered into an illegal and improper agreement to violate the CFAA, the ECSA, the Utah Code, and to engage in unfair competition.

189.   IKANO is informed and believes and on that basis alleges that the conduct as alleged herein constituted acts in furtherance of the illegal and improper agreement to violate the CFAA, the ECSA, the Utah Code, and to engage in unfair competition.

190.   IKANO is informed and believes and on that basis alleges, that in taking the actions described above, the Defendants, and each of them, were acting as agents of each of the other Defendants and were acting within the course and scope of that agency.

191.   As a proximate and foreseeable consequence of Defendants' conspiracy, IKANO has suffered and will continue to suffer damages as alleged herein, in an amount to be proven at trial.

192.   The above described conduct of Defendants was willful, malicious, fraudulent, and/or grossly negligent and demonstrates a knowing and reckless indifference to the rights of IKANO, such that an award of punitive damages to IKANO is warranted pursuant to Utah Code Ann. § 78-18-1.

49

## JURY DEMAND

IKANO hereby demands a jury for the claims raised in the first cause of action, the second cause of action, the third cause of action, the fourth cause of action, the ninth cause of action, the tenth cause of action, the eleventh cause of action, and the twelfth cause of action raised in this Complaint, to the extent those claims are not resolved as a matter of law in favor of IKANO.

## PRAYER FOR RELIEF

WHEREFORE, IKANO prays for relief as follows:

1.      That IKANO have judgment for compensatory and other damages against Defendants in an amount according to proof at trial for violation of the CFAA, for violation of the ECSA, for federal unfair competition, for breach of contract, for breach of the covenant of good faith and fair dealing, for quantum meruit/unjust enrichment, for fraudulent inducement, for unfair competition and business practices, and for civil conspiracy;

2.      That IKANO have judgment for compensatory and other damages against Nu Skin in an amount according to proof at trial for intentional interference with contract;

3.      For an award of punitive damages in an amount to be established at trial;

4.      For costs of suit and attorneys fees as provided by law; and

5.      For such other and further relief as the Court may deem just and proper.

Dated: August 14 , 2002.

HOLLAND & HART, LLP

By: _____

    Brent Johnson
    Brett Foster
    Bryan K. Benard
    *Attorneys for Defendant*
    *IKANO Communications, Inc.*

IKANO Communications, Inc.
265 East 100 South
Suite 245
Salt Lake City, Utah 84111

## CERTIFICATE OF SERVICE

I certify that on August 14, 2002, I served a copy of the foregoing document to

the following by

    ☐       U.S. Mail, postage prepaid
    ☒       Hand Delivery
    ☐       Fax

Milo Steven Marsden
Wesley D. Felix
Bendinger, Crockett, Peterson & Casey
170 South Main, Suite 400
Salt Lake City, Utah 84101

Sonja Burdash

2966404_1.DOC

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.